# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

_____

JIMMY NAZARIO, JR.,          )

                     )

      Petitioner/Appellant,    )

                     )

*v.*                     )     Case No.  18-6086

                     )     W.D. Okl. No.

JOE ALLBAUGH, DIRECTOR,   )     CIV-16-1243-HE

                     )     (lower docket)

      Respondent/Appellee.   )

_____

## RE-SUBMITTED
## BRIEF OF PETITIONER/APPELLANT
## AND REQUEST FOR A CERTIFICATE OF APPEALABILITY

_____

Appeal from the United States District Court
for the Western District of Oklahoma
The Honorable Joe Heaton
United States District Judge
D.C. No. CV-16-1243-HE

David Autry, OBA #11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669 [fax]
dbautry77@gmail.com

Lawyer for Petitioner/Appellant
Jimmy Nazario, Jr.

ORAL ARGUMENT NOT REQUESTED
Digital/Scanned  Documents Attached
September 14, 2018

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .v

PRIOR OR RELATED APPEALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PARTIES TO THE PROCEEDING
AND REFERENCES TO THE RECORD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

1. Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

2. Trial testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    a. Testimony of Priscilla Munoz and Albert Dutchover. . . . . . . . . . . . . . 5

    b. Testimony of Kanesha Plummer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    c. Defense case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

SUMMARY OF THE ARGUMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

PROPOSITION I

MR. NAZARIO WAS DENIED HIS SIXTH AND FOURTEENTH
AMENDMENT RIGHTS TO THE EFFECTIVE ASSISTANCE
OF COUNSEL BECAUSE THE TRIAL LAWYERS' CROSS-
EXAMINATION OF THE STATE'S TWO KEY WITNESSES
WAS PROFESSIONALLY UNREASONABLE, TO
PETITIONER'S PREJUDICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

Portion of the record where the issue was raised and ruled upon. . . . . . . .16

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

1. Trial counsel's ineffective performance with Munoz and Dutchover. . . . . . .16

   a. Priscilla Munoz. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

   b. Albert Dutchover. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

2. Legal Principles. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

3. The district court's ruling should be reversed. . . . . . . . . . . . . . . . . . . . . . 29

PROPOSITION II

TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO
REQUEST AN INSTRUCTION ON FIRST-DEGREE
MANSLAUGHTER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

Portion of the record where the issue was raised and ruled upon. . . . . . . 33

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

1. Relevant facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

2. Legal appropriateness of a manslaughter instruction. . . . . . . . . . . . . . . . . . . 34

3. Ineffective assistance of counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

PROPOSITION III

THE DISTRICT COURT ERRED IN NOT CONDUCTING AN
EVIDENTIARY HEARING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38

    Portion of the record where the issue was raised and ruled upon . . . . . . . .38

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

PROPOSITION IV

A CERTIFICATE OF APPEALABILITY SHOULD BE GRANTED
ON MR. NAZARIO'S INEFFECTIVE ASSISTANCE OF COUNSEL
CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4l

    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41

    Portion of the record where the issue was raised and ruled upon. . . . . . . . 42

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . 43

CERTIFICATE OF MAILING AND ELECTRONIC SERVICE. . . . . . . . . . . . 44

CERTIFICATE OF DIGITAL SUBMISSIONS . . . . . . . . . . . . . . . . . . . . . . . . . 45

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45

ATTACHMENTS

1) Report and Recommendation (Doc. 14), filed Feb. 13, 2018

2) Order Adopting Report and Recommendation (Doc. 16), filed April 11, 2018

3) Judgment (Doc. 17), filed April 11, 2018

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                         **PAGE**

*Anderson v. Attorney General of Kansas,* 435 F.3d 853 (10th Cir. 2005). . . . . . . .40

*Brumfield v. Cain,* ___U.S.___, 135 S.Ct. 2269 (2015). . . . . . . . . . . . . . . . . . . . 15

*Darks v. Mullin,* 327 F.3d 1001 (10th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . .15

*Hammon v. Ward,* 466 F.3d 919 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . 16

*Lee v. Clarke,* 781 F.3d 114 (4th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

*McClellan v. Rapelje,* 703 F.3d 344 (6th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . 29

*Miller-El v. Cockrell,* 537 U.S. 322 (2003). . . . . . . . . . . . . . . . . . . . . . . . . .41, 42, 43

*Montez v. McKenna,* 208 F.3d 862 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . 41

*Moore v. Beard,* 42 F.Supp.3d 624 (M.D. Pa. 2014) . . . . . . . . . . . . . . . . . . . . . . .28

*Parrino v. Archuleta,* 630 F.App'x. 739 (10th Cir. 2015). . . . . . . . . . . . . . . . . . . . 39

*Richards v. Quarterman,* 566 F.3d 5553 (5th Cir. 2009). . . . . . . . . . . . . . . . . . . . .35

*Roland v. Vaughn,* 445 F.3d 671 (3rd Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . .28

*Steinkuhler v. Meschner,* 176 F.3d 441 (8th Cir. 1999). . . . . . . . . . . . . . . . . . . . . .28

*Strickland v. Washington,* 466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . . 27, 32, 37

*Tennard v. Dretke,* 542 U.S. 274 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42

*Tucker v. Prelesnik,* 181 F.3d 747 (6th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . 28

*Williams v. Taylor,* 528 U.S. 362 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

**FEDERAL STATUTES**

28 U.S.C. §1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

28 U.S.C. §2253(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. §2253( c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41

28 U.S.C. §2254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2, 28,43

28 U.S.C. §2254(d)(1)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15, 32

28 U.S.C. §2254(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

28 U.S.C. §2254(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

28 U.S.C. §2254(e)(2)(A)(i)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

28 U.S.C. §2254(e)(1)(2)(A)(i)(ii)(B) . . . . . . . . . . . . . . . . . . . . . . . . . .38

 **STATE STATUTES**

21 O.S. § 701.8(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**STATE CASES**

*McHam v. State,* 2005 OK CR 28, 126 P.3d 662 . . . . . . . . . . . . . . . . . . . . . 35, 37

*Washington v. State,* 1999 OK CR 22, 989 P.2d 960 . . . . . . . . . . . . . . . . . . . 37

**DOCKETED CASES/UNPUBLISHED OPINIONS**

*Nazario v. Allbaugh,* W.D. Okl. No. CIV 16-1243-HE. . . . . . . . . . . . . . . . . . . . . 4

*Nazario v. State,* No. F-2014-345 (Okl. Cr. Aug. 6, 2015)
(unpublished summary opinion) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3, 16

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

JIMMY NAZARIO, JR.,          )
                                        )
       Petitioner/Appellant,    )
                                          )
v.                                )       Case No. 18-6086
                                          )       W.D. Okla. No. CIV 16-1243
JOE ALLBAUGH, DIRECTOR,     )       (lower docket)
                                          )
       Respondent/Appellee.    )

## PRIOR OR RELATED APPEALS

There are no prior or related federal appeals with respect to Mr. Nazario or this case.

## PARTIES TO THE PROCEEDING AND
## REFERENCES TO THE RECORD

Joe Allbaugh is the Director of the Oklahoma Department of Corrections and is the Respondent/Appellee in this case. Jimmy Nazario, Jr., an individual, is the Petitioner/Appellant.

References to the Appendix will be (App.), followed by the page number. References to the state trial transcript will be designated (Tr. I, II or III), followed by the page number. References to the state preliminary hearing transcript will be (PH Tr.), followed by the page number. References to the certified transcripts of the police interviews of state's witnesses Priscilla Munoz and Albert Dutchover,

which were part of the supplemental record submitted to the state appellate court in connection with Mr. Nazario's request for an evidentiary hearing, are labeled (Tr.M., Tr.D). The pretrial motion hearing transcript is labeled (M.Tr.). References to court filings in the state trial court will be (O.R.), followed by the page number. References to documents filed in Mr. Nazario's habeas action will be designated (Doc.), as numbered on the district court docket sheet, with the appropriate page number(s) and other citations.

## STATEMENT OF JURISDICTION

This is an appeal taken from the denial of a petition filed under 28 U.S.C. §2254. This Court has jurisdiction under 28 U.S.C. §§1291 and 2253(a).

## STATEMENT OF THE ISSUES

1. Was Petitioner deprived of his Sixth and Fourteenth Amendment rights to the effective assistance of counsel when his trial lawyers failed to use readily available materials to impeach the two key witnesses against him in order to discredit the state's case, and in neglecting to bring out evidence favorable to his trial defense?

2. Was Petitioner deprived of his Sixth and Fourteenth Amendment rights to the effective assistance of counsel when trial counsel failed to request an instruction on first degree manslaughter?

3.  Did the district court err in denying an evidentiary hearing on Mr. Nazario's ineffective assistance of counsel claims?

4.  Should a certificate of appealability be granted on the issues addressed above?

## STATEMENT OF THE CASE

Mr. Nazario was charged with second degree murder in violation of 21 O.S. §701.8(1) in the District Court of Comanche County, Case No. CF-2010-57.  He was convicted at a jury trial, and was sentenced to 25 years imprisonment.  (Doc. 14, pp. 1-2)(App. 80-81)

Mr. Nazario took a direct appeal to the Oklahoma Court of Criminal Appeals (OCCA).  He requested an evidentiary hearing on his claims of ineffective assistance of trial counsel pursuant to Rule 3.11 of the rules of that court.  Petitioner's conviction and sentence were affirmed in an unpublished summary opinion. *Nazario v. State,* Case No. F-2014-345 (Okl. Cr. Aug. 6, 2015) (Doc. 1, App. 41-45) Rehearing was not sought, and no petition for writ of certiorari was filed in the United States Supreme Court.  No state application for post-conviction relief was filed.

Based on the exhausted issues raised in the state direct appeal, Mr. Nazario filed a petition for writ of habeas corpus and a supporting brief in the United

States District Court for the Western District of Oklahoma on October 31, 2016.

*Nazario v. Allbaugh,* W.D. Okl. W.D. Okl. No. CIV-16-1243-HE.  An evidentiary

hearing was requested.  (Docs. 1, 2, App. 5, 48)  The state filed a response to the

petition, and the state court record was filed.  (Docs. 8, 9) (Said documents were

transmitted from the district court clerk's office and filed July 3, 2018).   A reply

to the state's response was filed.  (Doc. 13, App. 73)

On February 13, 2018 the magistrate judge issued a report and

recommendation that an evidentiary hearing and the petition be denied.  (Doc.

14)(App. 80-96)  Petitioner filed objections to the report and recommendation.[1]

(Doc. 15)(App. 97-104)  The district court judge issued an order adopting the

report and recommendation, denied a certificate of appealability, and entered

judgment for the Respondent on April 11, 2018.  (Docs. 16, 17)(App. 105-110)

Petitioner filed his notice of appeal on May 9, 2018.  (Doc. 18)(App. 111-112)

Petitioner addresses the substantive merits of his claims for habeas relief

first in order to show, as argued in Proposition IV, that he is entitled to a

certificate of appealability.

---

[1] The objections centered on the issues that are raised in this brief.
Petitioner did not object to, and is not appealing, the denial of habeas relief with
respect to what he claimed was improper testimony by a police detective which
invaded the province of the jury and prosecutorial misconduct.  (Doc. 1 pp. 31-32,
App. 35-36;  Doc. 2 pp. 13-16, App. 66-69;  Doc. 14, pp. 14-16, App. 93-95)

**STATEMENT OF THE FACTS**

## 1. Introduction

This case concerns the December 2, 2011 homicide of Eric Manigault at an apartment complex in Lawton, Oklahoma.

The defense was self-defense. Trial counsel marshaled little evidence supporting it. They unreasonably failed to impeach the key prosecution witnesses, Priscilla Munoz and Albert Dutchover, with prior inconsistent statements and their motives and bias for testifying for the prosecution. The defense failed to elicit from these witnesses previously known evidence and testimony that would have supported the defense theory, or which would have shown that, at worst, the homicide was heat of passion manslaughter rather than second degree murder. The evidence unreasonably omitted by the defense also could well have mitigated punishment, leading to a lesser sentence.

## 2. Trial testimony

### a. Testimony of Priscilla Munoz and Albert Dutchover

Mr. Nazario and Eric Manigault both lived at the Motif Manor apartments in Lawton. On the evening of December 11, 2011, Petitioner was at his apartment with Albert Dutchover. During the evening, Mr. Nazario's girlfriend, Priscilla Munoz, called him. They planned to meet each other, on foot, halfway between

-5-

their residences.  When Mr. Nazario and Dutchover met Munoz, she was with her

cousin, Jose Hernandez.[2]  The foursome began walking back to Mr. Nazario's

apartment.  (Tr. Vol. I 224-330)

As they approached the apartment, they passed Eric Manigault and his

friend Kanesha Plummer, who were standing near some cars.  Munoz testified

Manigault, whom she had never seen before, was talking on a cell phone, and said,

"Here he comes, here he comes," or "be here, here he comes."  Munoz did not

know what he was referring to.  (Tr. Vol. I 232-33, 269, 282)  Munoz described

Manigault as being very tall (by her estimate, 6'4").  He was wearing a long shirt

and baggy clothing. (Tr. Vol. I 268)

 Manigault came over and got in front of them, asking if they were "the

ones" who had been "tagging"[3] the apartment buildings.  She did not recall him

saying, "Are you the Mexicans who live in that apartment?" (Tr. Vol. I 270)

According to Munoz, Petitioner replied, "Yeah, and?"  Mr. Nazario's hands were

in his pockets.  Munoz saw one of his hands go up, then saw  "bright orange

flashes."  After the first "flash," Manigault put his hands up, started running, and

---

[2]  Dutchover was also a cousin of Priscilla Munoz.  (Tr. Vol. I 229)

[3]  "Tagging" refers to spray painting over the sign or symbol of a rival gang.
(Tr. Vol. II, 155, 174, State's Trial Exhibits 21, 22)

was apparently shot again. (Tr. Vol. I 234-35) Munoz testified that before the first shot, Manigault was talking in a loud voice and had his hands up, moving them in an animated fashion. (Tr. Vol. I 254, 273) His hands were empty and she never saw a weapon on him, although a knife was recovered from his back pocket by investigators at the scene. (Tr. Vol. I 255, Vol. II 128, 140, 164, State's Exhibit 8, Defendant's Exhibit 8) Munoz's viewpoint allowed her to see Manigault's hands only when he raised them, not if his hands were down and he was reaching for something. (Tr. Vol. I 279, 284)

Munoz testified that after the foursome began to run away, Hernandez told Mr. Nazario to give him the gun. (Tr. Vol. I 240) Munoz, Dutchover, and Petitioner then ran to a nearby Lowe's store. Munoz had told Hernandez, who ran off in another direction, to meet them at a nearby restaurant. (Tr. Vol. I 241) Petitioner called Mindy McGuire to pick them up at Lowe's. After this, they went to the Braums to meet Hernandez, but he was not there. They eventually went to the McGuire residence, where they were met by Hernandez. The gun was disposed of later that night. (Tr. Vol. I 242-43, 245-52)

The following Monday, December 5, 2011, Munoz was questioned by Detective Peralta and Detective Schwenk of the Lawton Police Department.

Without elaboration, she admitted she lied in her first statement because she was scared, but then told "the truth." (Tr. Vol. I 253-54)

Cross-examination largely served to re-emphasize Munoz's direct testimony. (Tr. Vol. I 257-91) Munoz acknowledged that in preparation for her trial testimony, she reviewed her video taped statement to police and her preliminary hearing testimony, but counsel did little to impeach her with either. (Tr. Vol. I 259-60) Counsel did elicit that Munoz initially told police she knew nothing about a shooting, but was at Lowe's with Petitioner and Dutchover on the evening of December 2 looking at Christmas trees. She stated she told another story which she did not recall, and might have told three stories. She eventually got a lawyer. (Tr. Vol. I 260-62)

With little elaboration, Munoz testified the police threatened to put her in jail and that she was "terrified" and felt bullied by Detective Peralta. (Tr. Vol. I 265-66) Questioned about the confrontation with Manigault, Munoz denied she was scared anything was going to happen, but was reminded of her statement to Detective Peralta that the incident happened "so fast" and she was "scared." (Tr. Vol. I 280) After the shooting, Mr. Nazario told Munoz that he "had to do it." (Tr. Vol. I 291) Munoz testified she was given immunity from prosecution as long as she did not give false testimony. (Tr. Vol I 291)

Albert Dutchover went to Petitioner's apartment in the early evening of December 2 to "hang out." (Tr. Vol. II 10)  Mr. Nazario had a semi-automatic handgun at the apartment, although he did not own it. (Tr. Vol. II 11)  Petitioner took the gun with him when they left the apartment.  Dutchover initially testified Mr. Nazario did not explain why he took the gun, but then said he took it because members of the Gangster Disciples were looking for them for crossing out their gang signs at the apartment complex.   (Tr. Vol. II 29)

After meeting up with Munoz and Hernandez and while walking back to Mr. Nazario's apartment, Manigault[4], who had been standing with a female in the parking area, confronted them, waving his hands up and down and asking in a loud voice whether they were the ones who had been tagging Gangster Disciple's symbols on the apartment buildings.  (In contrast with Priscilla Munoz, Dutchover testified it was the female who was talking on the phone, saying "come here, they are here."  (Tr. Vol. II 25-27, 56-58))  Mr. Nazario responded, "No."  Manigault continued the confrontation and kept coming closer, even after Petitioner told him to "back up."

---

[4]  Like Priscilla Munoz, Dutchover had never seen Mr. Manigault before. (Tr. Vol. II 38)

Dutchover described Manigault as being "very fired up." He kept pulling his pants up and moving his hands close to his pockets. Dutchover testified he never saw Manigault with a weapon. (Tr. Vol. II 42) As Manigault continued to approach, Mr. Nazario took the gun from his front pocket and pointed it, again twice telling Manigault to back up. Manigault continued to approach with his fists balled up close to his pockets. Petitioner, who has asthma and was experiencing breathing problems, then panicked and fired the gun. (Tr. Vol II 30, 60) Manigault pulled his arms up and looked down at his chest. (Tr. Vol. II 31) As he turned, Dutchover heard a second shot. (Tr. Vol. II 32) According to Dutchover, two adult males in the vicinity saw the shooting. (Tr. Vol. II 34)

In a manner similar to Priscilla Munoz, Dutchover described going to Lowe's and then to Braums's in an attempt to meet up with Hernandez. Dutchover described Mr. Nazario as "freaking out" while they were in Lowe's. He did not know what happened to the gun. (Tr. Vol. II 43)

As with Priscilla Munoz, cross-examination largely reinforced the testimony on direct, with but a few exceptions. Although Dutchover admitted to reviewing his preliminary hearing testimony in preparation for his trial testimony, it was not really utilized in an attempt to impeach him. Nor were his statements to the police used to impeach him. Dutchover was initially questioned by the police when he

was in jail on another charge.  (Tr. Vol. II 43-45)  Without follow up questioning,

Dutchover acknowledged telling police he had seen the victim with a knife, but

stated he had lied and did not actually see one.  He denied seeing Manigault reach

for his back pocket.  (Tr. Vol. II 45, 59-60)  Dutchover denied being in fear of

Manigault, stating he just thought they were going to have a brawl and that he was

ready to fight.  (Tr. Vol. II 62)  He did not recall Mr. Nazario telling him

afterwards that he "had to do it."  (Tr. Vol. II 62-63)  When asked if he was

receiving any benefit for his testimony, Dutchover replied that he was "just"

getting immunity from prosecution.  (Tr. Vol. II 63)

### b.  Testimony of Kanesha Plummer

Kanesha Plummer had been a friend of Ervin Managault since 2010.  He

lived at the Motif Manor Apartments with his mother and sister.  (Tr. Vol. II 70)

On the evening of December 2, she had been at Manigault's apartment, and was

going to return after running some errands.  (Tr. Vol. II 72-74)  When she was

coming back to the apartment complex, she saw four people (Petitioner and his

friends) walking in the complex.  Even though they were just walking, she thought

they were "suspicious" and had "possibly" been the ones who were doing the

"tagging."  (Tr. Vol. II 74)   She could not identify any of these individuals and

could not identify the shooter.  (Tr. Vol. II 82, 97)  She called Manigault to report

what she saw.  (Tr. Vol. II 74)  After parking her car, she went to Manigault's apartment.  He was talking on the phone and exiting the apartment as she got to the door.   (Tr. Vol. II 78-79)

After leaving the apartment, Manigault hung up from whoever he was talking to and called "Kevin," who was apparently the security guard at the apartment complex, telling him that the people who may have been doing the "tagging" were there.  Kevin told him to go back to his apartment because he (Manigault) "did not know what they had."  (Tr. Vol. II 79)

Ignoring Kevin's advice, Manigault confronted the four people, asking if they were the ones who were doing the "tagging."  (Tr. Vol. II 80, 100-01) According to Plummer, Manigault asked this in a calm voice.  He was not yelling or animated, and never reached for his pants pockets, although she did not notice whether he was hiking his pants up.  (Tr. Vol. II 105-07, 109-111)  One of them said, "Yeah, and so?", stepped back, and pulled a gun from his pocket.  According to Plummer, Manigault put his hands straight up in the air, and was shot.  He looked down at his chest; as he turned to run, he was shot at again.  Plummer did not know whether the second shot hit Manigault.  (Tr. Vol. II 80-81, 83-84) Manigault managed to run to his apartment, and Plummer met him there, where he

collapsed.  (Tr. Vol. II 82, 85, 87)  An ambulance and police arrived within a few minutes.  (Tr. Vol II 87-88)

Even though Plummer testified she did not miss any details, she never noticed the knife in Manigault's back pocket, even though after being shot, he fell face down and the knife was clearly visible.  (Tr. Vol. II 107-08, 113, 128, 162, 185-86, Defendant's Exhibit 3, State's Exhibit 8)  The knife had a serrated six inch blade.  (Tr. Vol. II 164)

When shown a picture of a bottle of alcohol on the kitchen table in Manigault's apartment, she at first denied any knowledge of him drinking that evening, and then admitted that he had been drinking.  (Tr. Vol. II 95-96, Defendant's Exhibit 2)   She claimed not to know how intoxicated Manigault was, if at all.  (Tr. Vol. II 107-08)  The autopsy toxicology report showed that Mr. Manigault was highly intoxicated.  His blood alcohol content was .29 and the alcohol content from his vitreous fluid was .34.  (Tr. Vol. II 221, 232-33, State's Exhibit 29)

**c.  Defense case**

The defense rested without presenting any evidence.  (Tr. Vol. II 236-40)

Additional relevant facts in support of Mr. Nazario's habeas claims will be discussed in the body of his arguments.

# SUMMARY OF THE ARGUMENTS

Trial counsel were professionally unreasonable, to Mr. Nazario's prejudice, in failing to effectively impeach the testimony of "star" prosecution witnesses Munoz and Dutchover with their statements to the police and their preliminary hearing testimony. Had they done so, the state's case for second degree murder would have been crippled and the case for self-defense would have been enhanced significantly.

Likewise, trial counsel were ineffective in failing to request an instruction on first-degree heat of passion manslaughter. Such an instruction was warranted even on the existing trial record, and certainly would have been warranted had trial counsel effectively cross-examined and impeached Munoz and Dutchover.

Petitioner established that he was entitled to an evidentiary hearing on his ineffective assistance of trial counsel claims, and the district court erred in not affording him one.

Because reasonable jurists could disagree about the manner in which the district court resolved Mr. Nazario's ineffective assistance of trial counsel claims and his request for an evidentiary hearing, a certificate of appealability should be granted on the issues raised in this appeal.

# ARGUMENTS

## PROPOSITION I

**MR. NAZARIO WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE THE TRIAL LAWYERS' CROSS-EXAMINATION OF THE STATE'S KEY WITNESSES WAS PROFESSIONALLY UNREASONABLE, TO PETITIONER'S PREJUDICE.**

**Standard of Review:**  Where, as here, the state appellate court has ruled on the merits of a constitutional claim, habeas relief is only available where the state appellate court's decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, or where the state court decision rests on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *Williams v. Taylor,* 529 U.S. 362, 407-08 (2000); *Brumfield v. Cain,* ___U.S.___, 135 S.Ct. 2269, 2277 (2015); 28 U.S.C. 2254(d)(1(2).

Where the state courts have decided the merits of a federal constitutional claim, it is presumed the state court's factual findings are correct.  A habeas petitioner bears the burden of rebutting this presumption by clear and convincing evidence.  28 U.S.C. §2254(e)(1); *Darks v. Mullin,* 327 F.3d 1001, 1007 (10th Cir. 2003).

The district court's conclusions of law are reviewed *de novo*. Its factual findings are reviewed for clear error. *Hammon v. Ward,* 466 F.3d 919, 928 n.9 (10th Cir. 2006).

**Portion of the record where the issue was raised and ruled upon:** Mr. Nazrio raised this issue in his state direct appeal. The OCCA rejected it in an unpublished summary opinion. *Nazario v. State,* No. F-2014-345 (Okl. Cr. Aug. 6, 2015). (Doc. 1, Exh. 1, App. 41-45) This was the first issue raised in Mr. Nazario's habeas petition. (Doc. 1, pp. 5-28, App. 9-32; Doc. 2, pp. 2-7, App. 55-60) The magistrate judge denied relief on this claim in his report and recommendation. (Doc. 14, pp. 9-13, App. 88-92) The district court adopted the magistrate's report and recommendation, and entered judgment for the Respondent. (Docs. 16, 17, App. 105-110)

## ARGUMENT

### 1. Trial counsel's ineffective performance with Munoz and Dutchover

Counsel inexplicably, and without any reasonable strategy, failed to effectively utilize the preliminary hearing testimony and statements to the police of Priscilla Munoz and Albert Dutchover to impeach their trial testimony. Counsel also failed to elicit previous statements and testimony from these two witnesses which supported the defense of self-defense or which would, at any rate,

have supported a verdict of heat of passion manslaughter (see Proposition II) or a lesser punishment.[5]

The preliminary hearing transcript and the police interviews, including transcripts and video tapes of the interviews, were possessed by defense counsel. These materials were cited by both original trial counsel and the lawyers who wound up trying the case in their pretrial discovery statements. (O.R. 494-96, 578-79)

It was especially critical to impeach these witnesses and draw out their previous statements helpful to the defense theory in light of the fact Mr. Nazario did not testify and no defense witnesses were presented. The entire defense rested on cross-examination. Trial counsel also failed to utilize these materials to show the bias of these witnesses, *i.e.,* their interest in tailoring their trial accounts to the prosecution's theory of the case to avoid the threat of criminal prosecution.

### a. Priscilla Munoz

Priscilla Munoz was subject to serious impeachment as to what she actually witnessed based on her preliminary hearing testimony and her initial interview with the police, but it was not attempted. Trial counsel also failed to exploit

---

[5] Counsels' failings in neglecting to bring out evidence showing this was a manslaughter case at worst go to the probability of an outcome different than a second degree murder conviction.

previous statements and testimony given by Munoz which would have supported a self-defense or manslaughter claim.

As noted, Munoz testified at trial she saw Petitioner remove his hand from his pocket and then saw two "flashes," which is the equivalent of saying that she saw Mr. Nazario shoot Ervin Manigault with little or no provocation. However, when she was cross-examined at the preliminary hearing, Munoz testified she did not see a gun, and was not sure if Petitioner even had a gun. (PH Tr. 17) She testified she was not really paying attention to what was happening. (PH Tr. 18)

Munoz was questioned at length by the police on December 5, 2011. (Tr.M.) When Munoz was allowed to call her mother and father from the police station after the officers left the interview room (and without knowing she was being recorded), she repeated the story about just going to Lowe's and knowing nothing about a shooting. Munoz told her mother and father: 1) she did not know what Mr. Nazario did before they went to Lowe's; 2) that the police "think" Petitioner did the shooting; 3) "they told me, I guess, somebody was shot, and they told me I was there, and I wasn't even there"; 4) "I guess somebody was shot, and I don't know, and they say it was three Mexican guys and a girl, but there's a lot of girls, and J.J [Mr. Nazario] and his cousin bring girls there all the time"; and 5) "You know I'm crying when I tell you the truth. No, it wasn't, I don't even think

it was J.J.  I don't know.  I think it was his cousin."  Munoz told her mother she did not know what Mr. Nazario did.  (PH Tr. 60, Tr.M. 75-76)

Detective Peralta had told her earlier that the police believed the shooter was either Petitioner or his cousin "Little Joe" (Jose Villanueva), and that "Little Joe" was a "dangerous son-of-a-bitch."  (PH Tr. 45, Tr. M. 44, 53, 55)  With respect to the shooting, she told the police at one point they should talk to "Little Joe," before ultimately claiming he was not there.  (Tr.M. 56, 100)  She told the police "Little Joe" was doing the tagging at the apartments, and it was not Petitioner who "did everything." (PH Tr. 66-67, Tr.M. 60)  Asked if "L.J." was the shooter, Munoz responded she did not know.  (Tr.M. 60)

When Munoz's father arrived at the police station and she was allowed to talk to him outside the physical presence of the police (where she was again being recorded without her knowledge), Munoz told him: 1) "I don't know who shot him.  But I was there, but I don't know."; 2) She was with Petitioner, Dutchover, and "Pelon" (Jose Hernandez), and "I don't know which one of them did it."; 3) that she did not know who had a gun, that she heard two shots, and that she was not "right there"; she was trying to "get away" because she did not want to see them fighting; and 4) in contrast to her trial testimony, she said that nobody admitted to the shooting.  Munoz asked her father if she could leave the police

-19-

station if she "told them." (PH Tr. 63, Tr.M. 85-91)  She explained to her father they were walking to the apartment and "this guy" came up.  She *heard* two shots, and then they went to Lowe's.  (PH Tr. 63, Tr.M. 85-91)  She told her father, "That's all I know. ... I don't know who shot him."  (PH Tr. 63, Tr.M. 89)

The police then re-entered the interview room.  After being read her rights, Munoz stated initially she did not want to talk anymore, and asked what would happen to her if she did not talk.  After being told it would be "up to the D.A.," she was told she was going to be arrested and charged as an accessory.  (Tr.M. 92-98)  Munoz then agreed to continue talking, saying she was scared and people would be mad at her.  (Tr.M. 98)  She then stated "a guy" came up and Petitioner "just shot him," after which they went to Lowe's and were picked up by Mindy McGuire.  (Tr.M. 99)  She did not stick to this story.

In contrast to her trial testimony, Munoz stated she did not know what the victim said, and that, in what could only be described as an aggressive move, Manigault *ran up to them.* (Tr.M. 100, 107-08)  His hands were out, and she did not know if he had anything in his hands. (Tr.M. 108)  Munoz later amended this to saying she "thought" the victim may have said something about tagging.  In contrast to her trial testimony about Mr. Nazario responding, she did not know if anyone said anything back.  (Tr.M. 108, 122)

Against her trial testimony, Munoz stated that after hearing Manigault say "here he comes" and asking more people to come over, she had a "bad feeling" he was talking about Mr. Nazario; had a "bad feeling a bad man was coming"; and believed something "bad" was going to happen. (PH. Tr. 65, Tr.M. 103, 104) Munoz then backed off her previous statement and said she "didn't know" if Petitioner actually shot Manigault, saying she was scared and tried to get away, and only heard the gunshots. She never saw a gun and never saw Petitioner pull a gun out, although she said Mr. Nazario "grabbed something." She never saw anything in his hands. (PH Tr. 66, 67, Tr.M. 104, 107, 109)

Munoz told the police she did not know if Petitioner was the only one who "pulled something out"; she only assumed Mr. Nazario had a gun because she heard shots. It was possible someone else had a gun. (PH. Tr. 67, 68, Tr.M. 110) Detective Schwenk reminded Munoz she had stated earlier that "J.J." pulled a gun out and fired, and asked her if she was now saying she did not know. Munoz responded she did not know who it was and did not know who fired. (PH Tr. 70, Tr.M. 110) Because she was not paying attention, she did not see a knife in Mr. Manigault's hands, but it was possible he had a knife. (PH Tr. 76-77) Consistent with her trial testimony, Munoz testified at preliminary hearing Mr. Nazario told her after the shooting, "I had to shoot him." (PH Tr. 83) However, she told the

-21-

police no one talked about the shooting afterwards. (PH Tr. 83, Tr.M. 114) At an early point in the interview, she told Detective Peralta, "I don't mean to lie, it just comes out."[6] (PH Tr. 50, Tr.M. 15)

While trial counsel touched briefly on the fact Munoz was scared and felt intimidated by Detective Peralta (Tr. Vol. I 265-66), the repeated nature of his threatening statements to her was not explored. These comments went directly to her bias and interest in toeing the prosecution's line, particularly in light of the fact she had been granted immunity. (O.R. 455-56, PH Tr. 7) Munoz indicated at preliminary hearing that it was Detective Peralta who determined if she were telling "the truth" for purposes of her immunity deal. (PH Tr. 57)

Munoz was told repeatedly by Detective Peralta that she was either a "witness or a suspect"; that if he had his way, all of them would be charged; and that she could either testify or go to prison. Detective Peralta told her she did not know how close she was to being locked up. Munoz was threatened with a murder charge, and was told how bad it would be for her in prison. (PH Tr. 47, 55, 56, 60, 64, Tr.M. 47-48, 53, 64, 65-69, 92, 98) Munoz repeatedly told the police she

---

[6] At preliminary hearing, Munoz said she believed she stated, "I don't mean to laugh, it just comes out," but the certified transcript of her interview, which was done by a court reporter, states she said, "I don't mean to lie... ." (PH Tr. 50, Tr.M. 15)

wanted to go home.  (PH Tr. 63, 65, Tr.M. 84, 91-92)  It was only after being told she was going to be locked up and charged as an accessory that "the truth" confusingly emerged.  (Tr.M. 98-99)

In cross-examination, trial counsel made it appear that Munoz initially told a "false story" or "lied," but then rather quickly went with a version consistent with her trial testimony.  (Tr. Vol. I 261-62, 265-66)  This was not the case at all.  Trial counsel failed to point out that despite being threatened, lectured at length, and called a liar, Munoz persisted in her story that she knew nothing about a shooting and had simply been at Lowe's looking at Christmas trees with Petitioner and Dutchover.   She told the police repeatedly she was telling "the truth," was not trying to protect Mr. Nazario, had not been to the apartments that night, and only heard about the shooting from street rumor.  (Tr.M. 8-14, 16, 18-21, 25-28, 31-36, 38-43, 49-50, 54, 62-64, 70-71, 73, 81, 82)   Munoz told the police that although she did not know who committed the shooting, she "had a feeling" it was "Little Joe."  (Tr.M. 62-63)  In other words, she habitually lied, assuming the "truth" of her trial testimony, a fact which would surely affect her overall credibility. Counsel even failed to emphasize this point when Detective Peralta testified that Munoz gave them little or nothing for two and a half hours.  (Tr. Vol. II 193)

Finally, trial counsel failed to impeach Munoz with the fact that even after she finally told "the truth" (or part of it) in the first police interview, she adamantly denied knowing what happened to the gun, in contrast to her trial testimony about it being at an abandoned house; her trip with Melissa McGuire to retrieve it; and Mindy McGuire later getting rid of it. (Tr.M. 100, 121)

### b. Albert Dutchover

To impeach Dutchover's credibility, counsel failed to bring out the details of what he initially told the police: that he knew absolutely nothing about any shooting because from the early afternoon of Friday, December 2, 2011 to Saturday morning, he was at another apartment complex with his girlfriend "partying," and that he had been intoxicated the whole time. He initially told the police he had not even been at the apartment complex where the shooting occurred during the previous three weeks. He denied being at Lowe's, and said that he had only heard about the shooting. He even denied knowing Mr. Nazario; he had just "heard of him." Dutchover claimed that he last saw his cousin Priscilla Munoz "a week ago." He "guessed" J.J. was her boyfriend. (Tr.D. 8-19)

Dutchover changed his tune after being shown the surveillance tape at Lowe's (Tr.D. 20), but much of what he told the police and testified to at

preliminary hearing, which was supportive of the defense theory, was never imparted to the jury when he was cross-examined at trial.

Dutchover testified at preliminary hearing that Mr. Nazario only took out a gun to *protect himself* after Mr. Manigault kept approaching him with his fists balled up near his pockets, and after he was told to back off. (PH Tr. 98) While the latter was testified to at trial, the all important qualifier of Petitioner acting to protect himself was not. Dutchover previously testified that December 2 was the *only and first time* Petitioner carried a gun, because he was afraid something was going to happen that day. (PH Tr. 98-99, 105) Curiously, Dutchover acknowledged at preliminary hearing that since he had immunity, he could go free even if he was the shooter. (PH Tr. 110)

Dutchover told the police that at the time of the confrontation, Manigault was with a male, not a female. (PH Tr. 111, 119, Tr.D. 24) When asked under oath at preliminary hearing if it was true, as he had told the police, that the girl or guy called over two more people who had knives during the confrontation, he affirmed this was true. (PH Tr. 112, Tr.D. 24) Other people were called over and showed up during the confrontation and came toward Petitioner and his group. A lady on the second floor of the apartment complex was yelling for more people to come over to join the confrontation. (PH Tr. 112-113, Tr.D. 25, 27, 36)

Dutchover described three people standing behind the victim and his companion, with more people apparently willing to come to their aid in the parking lot. (PH Tr. 115, Tr.D. 27) Dutchover told the police two of the people assisting Manigault had knives out, and he thought they also may have had guns. (Tr.D. 24, 29) As these people came toward Mr. Nazario and his group, Petitioner was shaking and was having an asthma attack. (PH Tr. 113, Tr.D. 48)

In complete contrast to his trial testimony, Dutchover told the police the man later identified as Ervin Manigault, as well as his friends, were lying in wait for them at the apartment complex. Manigault started throwing gang signs, yelled at them, and accused Petitioner and his friends of "dissing" the Gangster Disciples. Manigault approached them with his hands "swinging up." (Tr.D. 25-27, 36, 39, 40, 47)

At preliminary hearing, Dutchover affirmed that his statement to the police that Manigault had a knife and that other people were coming to assist him was the truth, but on re-direct examination said he never saw Manigault with a knife but did see him reaching into his pocket. (PH Tr. 114, 115, 116-17) Dutchover told the police he knew Manigault had a knife because he "pulled something." (Tr.D. 30-31, 41) He also affirmed that Petitioner fired a warning shot, and that Manigault then kept coming and reached into his pocket. It was only after this

that Mr. Nazario "freaked out" because he was scared, and shot Eric Manigault. Petitioner told Dutchover afterward that he acted because he was scared. (PH Tr. 115, 119, Tr.D. 28, 47-48) Dutchover testified at preliminary hearing that he told Mr. Nazario while they were at Lowe's that he should get a lawyer because he acted in self-defense, but that Petitioner left the area because he was scared. (PH Tr. 114, 115, Tr.D. 34)

Counsel also failed to impeach Dutchover with the fact that when he talked to the police, he tried to secure a deal on a pending burglary charge he was facing in exchange for his cooperation. (Tr.D. 60-86) This charge was later resolved favorably to Dutchover with him receiving a suspended sentence on February 28, 2014, approximately two weeks after Mr. Nazario's trial concluded. (Supplemental Record on direct appeal, docket sheet, *State of Oklahoma v. Albert Dutchover,* Comanche County Case No. CF-2011-569)

## 2. Legal Principles

Claims of ineffective assistance of counsel are judged under the familiar two-part test of *Strickland v. Washington,* 466 U.S. 668, 686-87, 693-94, 696 (1984). A defendant claiming he or she received ineffective assistance of counsel is required to show: 1) that counsel's performance was constitutionally deficient, in that counsel's errors or omissions were professionally unreasonable and fell

outside the wide range of defensible trial strategy, and 2) the defendant was prejudiced because absent counsel's errors or omissions, there is a reasonable probability that the verdict would have been different. *Id.* "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than ones with overwhelming record support." *Id.*; 466 U.S. at 696.

The failure to impeach important prosecution witnesses and to elicit evidence favorable to the trial defense has been found to justify habeas relief in analogous cases. *E.g., Tucker v. Prelesnik,* 181 F.3d 747, 757 (6th Cir. 1999)(failure to impeach victim with available evidence from medical records to highlight significant, contradictory prior statements); *Steinkuhler v. Meschner,* 176 F.3d 441, 445 (8th Cir. 1999)(failure to impeach sheriff, a key witness); *Moore v. Beard,* 42 F.Supp.3d 624 (M.D. Pa. 2014)(trial counsel ineffective for failing to impeach a key witness and for failing to call another witness who could have supported the defense theory). *See particularly, Roland v. Vaughn,* 445 F.3d 671, 682 (3rd Cir. 2006)(counsel was ineffective for failing to investigate and present

evidence of self-defense; here, Mr. Nazario's lawyers failed to marshal available evidence from the preliminary hearing transcripts and police interviews to highlight significant contradictions in the witness accounts and to elicit previous statements and testimony – particularly from Albert Dutchover – which supported Petitioner's claim of self-defense); *McClellan v. Rapelje*, 703 F.3d 344 (6th Cir. 2013)(failure to present readily available evidence supporting defense of self-defense was ineffective assistance).

### 3. The district court's ruling should be reversed

The magistrate judge, whose report and recommendation were adopted by the district court, rejected this argument for relief because: 1) counsel's cross-examinations of Munoz and Dutchover constituted a reasonable strategy; 2) since the defense was self-defense and Mr. Nazario in effect admitted he was the shooter, cross-examining Munoz and Dutchover about her earlier statements in which she claimed she knew and/or saw virtually nothing would not have advanced the defense case; and 3) cross-examining Albert Dutchover about his previous statements and testimony that supported the claim of self-defense would have backfired because these statements contradicted other statements he had made. In short, the types of cross-examination Mr. Nazario says should have been conducted would not have advanced the claim of self-defense. Therefore, the

OCCA's denial of this issue on direct appeal was not contrary to, or an unreasonable application, of federal law as determined by Supreme Court precedent. (Doc. 14, pp. 9-12, App. 88-91)

This reasoning should be rejected. At trial, Priscilla Munoz testified in support of the state's second degree murder theory. The credibility of her account, and that of the state's theory as a whole, would have been significantly damaged if her many, many prior inconsistent statements, including a claim that someone else may have been the shooter, had been examined in detail on cross-examination. Combined with additional impeachment by exploring her previous statements which suggested self-defense, and the several prior statements and testimony given by Dutchover which supported the defense of self-defense, the chances for an acquittal based on the self-defense theory would have increased immeasurably. As well, the persuasiveness of the state's second degree murder case would have been gravely diminished if the state's two key witnesses were made to look unreliable. All Petitioner had to raise was a reasonable doubt, and an unreliable witness who can be shown to have been all over the map figures into that calculus.

The fact Albert Dutchover's exculpatory statements and testimony were contradicted by other statements and testimony he offered is no reason to have

foregone, or ineffectively pursued, this line of cross-examination. The portions of Dutchover's previous statements and testimony supporting the claim of self-defense were far better than anything the defense was able to extract through its "strategy," and the contradictions, as with Munoz, could only have helped the defense by showing that like her, Dutchover was an unreliable witness who could not be trusted beyond a reasonable doubt. This argument is enhanced because Munoz's and Dutchover's testimony in support of a second degree murder theory only seemed to come about after promises of immunity from prosecution, promises that were fulfilled.

In this light, the reasonable strategy (which is never persuasively articulated in the report and recommendation) the magistrate judge and the district court credit trial counsel with pursuing looks professionally unreasonable.

The prejudice from counsel's strategy-free failure to simultaneously impeach the credibility of Munoz and Dutchover and elicit evidence in support of the self-defense claim is apparent. In what amounted to a trial lasting a little over two days, and even with the somewhat threadbare cross-examinations that were undertaken, the jury deliberated for five hours and asked at one point if an alternative to murder two was available. The jury asked for an instruction to be

clarified, and also asked what would happen in the event of a hung jury.  (O.R. 628-30, Tr. III 40-41)

The difficulty the jury had in reaching a verdict, as reflected by its communications with the trial court, shows there is a reasonable probability that whatever doubts the jury expressed about the state's case would have blossomed into reasonable doubts had effective cross-examination been accomplished. Effective cross-examination of these two witnesses also would have laid the groundwork for an instruction on heat of passion manslaughter, or led to the imposition of a lesser punishment.  The OCCA's rejection of this issue was an unreasonable application of *Strickland, supra*, and rested on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, including on appeal, demonstrating the state's key witnesses could have been, but were not, effectively cross-examined in a manner that would have seriously undercut the prosecution's case.  28 U.S.C. §2254(d)(1)(2).

## PROPOSITION II

**TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO REQUEST AN INSTRUCTION ON FIRST-DEGREE MANSLAUGHTER.**

**Standard of Review:** The same standard (or standards) of review apply to this argument as apply to the argument made in Proposition I.

**Portion of the record where the issue was raised and ruled upon:** The

OCCA ruled on the merits of this claim. (Doc. 1, Exh. 1, App. 41-45) This issue

was raised in Mr. Nazario's petition for writ of habeas corpus and supporting

brief. (Doc.1, pp. 28-31, App. 32-35; Doc. 2, pp. 7-13, App. 60-66) The

magistrate judge rejected it in his report and recommendation. (Doc. 14, pp. 13-

14, App. 92-93) The district court adopted the magistrate's report and

recommendation, and entered judgment for the Respondent. (Docs. 16, 17, App.

105-110)

## ARGUMENT

### 1. Relevant facts

The trial court instructed the jury on the defense of self-defense (Tr. Vol. III

3-5, O.R. 616-23), believing evidence showing the victim and his female

companion aggressively confronted Mr. Nazario and were overheard calling more

people to the scene on the phone (E.g., Tr. Vol. I 269-72, 232) raised enough

evidence to warrant the instructions. (Tr. Vol. III 3-5)

Albert Dutchover testified that after Mr. Manigault confronted them,

shouting and accusing Petitioner of "tagging" apartment buildings, Manigault

continued the confrontation, and began approaching Mr. Nazario in an aggressive

manner. Manigault came closer and closer with his fists balled up and made

movements toward his pants pockets, even after Petitioner told him to "back off" twice. It was only at this point Mr. Nazario produced the gun, "panicked," and fired. (Tr. Vol. II 28-31) As noted, a knife was found in the victim's pants pocket. (Tr. Vol. II 140; State's Exhibit 3, Defendant's Exhibit 8) Dutchover originally told the police he had seen a knife on Manigault, but testified that he never saw the victim with a knife. (Tr. Vol. II 45, 59) Dutchover described the victim as very "fired up" at the beginning of the confrontation, shouting and waving his arms.

Priscilla Munoz gave similar testimony, and had told the police she was scared about what was going to happen. (Tr. Vol. I 273, 280, Tr. Vol. II 42, 58) After the shooting, Mr. Nazario told Munoz, "I had to do it." (Tr. Vol. I 291) The record showed the Mr. Manigault was much larger than Mr. Nazario, who had asthma and breathing problems. (Tr. Vol. I 267, Tr. Vol. II 60)

Trial counsel argued Mr. Nazario should be acquitted because he was in fear of death or great bodily harm, and was therefore acting in self-defense. (Tr. Vol. III 20-25)

## 2. Legal appropriateness of a manslaughter instruction

These facts were likewise sufficient to instruct on heat of passion manslaughter, and counsel's failure to request manslaughter instructions was a

hallmark of ineffective assistance. The evidence outlined above was more than

sufficient to show that, if Mr. Nazario was not legitimately acting in self-defense,

his fear of being injured or perhaps even killed as a result of the confrontation

started by Ervin Manigault (who, regardless of what the witnesses at trial claimed

they did or did not see, was armed with a knife), created the type of heat of passion

emblematic of first degree manslaughter. This is true even if Mr. Nazario's fears

were unfounded and he was not himself free from blame. At a minimum, the trial

evidence was sufficient to mitigate, if not altogether to excuse, Mr. Nazario's

actions. Instructions on heat of passion first-degree manslaughter often, though

not always, go together. *E.g., McHam v. State,* 2005 OK CR 28, ¶¶ 14-15, 126

P.3d 662, 668.

Under the particular facts of Mr. Nazario's case, it was simply not

professionally reasonable for trial counsel to fail to ask for a manslaughter

instruction. The proof that had a manslaughter instruction been given, there would

have been a reasonable probability of an outcome other than a second-degree

murder verdict, is abundant when one considers the length of deliberations, the

jury's questions about one of the instructions, its question as to what would

happen in the event of a hung jury, and especially, its question regarding *the*

*availability of an option other than second-degree murder.*  (Tr. III 40-41, O.R. 628-630)

**3.  Ineffective assistance of counsel**

Based on the jury's inquiries and the length of time it took to reach of a verdict, it is entirely possible or even likely that had the jury been instructed on the lesser-included offense of heat of passion manslaughter, it would have rejected the second degree murder charge and convicted on the lesser offense.  Counsel was thus ineffective for failing to request instructions on this lesser-included offense. *Lee v. Clarke,* 781 F.3d 114 (4th Cir. 2015)(in habeas case, counsel was found ineffective for failing to request an instruction defining "heat of passion," even though the jury was instructed on both murder and manslaughter; in Mr. Nazario's case, the lesser-included offense instruction was never even requested); *Richards v. Quarterman,* 566 F.3d 553 (5th Cir. 2009)(among other reasons, counsel was ineffective for failing to request lesser-included offense instructions, resulting in habeas relief).

The district court rejected this claim for relief based on its finding, consistent with the opinion of the OCCA, that counsel were not ineffective for failing to request a first-degree manslaughter instruction, since the trial evidence did not support giving the instruction.  The magistrate judge held the OCCA's

determination was final, because whether, as a matter of state law, the evidence is sufficient to give a lesser-included offense instruction is not a question the federal courts can review. (Doc. 14, pp. 13-14, App. 92-93)

However, the OCCA rejected this argument in a conclusory fashion which overlooked the evidence, rendering its decision unreasonable in light of the facts. (Doc. 2, p. 11, App. 64) 28 U.S.C. §2254(d)(2). Only "some" evidence is needed to support a lesser-included offense instruction, and the evidence of manslaughter in the trial record is akin to that which has been found to justify first-degree manslaughter instructions in similar cases. Sufficient provocation to create a heat of passion can include the kinds of "words, threats, menaces, or gestures" the trial record shows Eric Manigault engaged in. *Washington v. State,* 1999 OK CR 22, ¶ 13 n. 4, 989 P.2d 960, 979 n. 4. Only "some" evidence is needed to justify a lesser-included offense instruction. *McHam v. State, supra.* The danger to the defendant not need be real, and the defendant need not be free of blame himself before a manslaughter instruction is warranted. *McHam v. State, supra.*

Because the OCCA's determination that a manslaughter instruction was not supported on the facts was based on an unreasonable determination of those very same facts, its finding that trial counsel were not ineffective for failing to request first-degree manslaughter instructions was contrary to, or an unreasonable

application of, *Strickland v. Washington, supra.* The district court's denial of habeas relief on this issue should be reversed.

## PROPOSITION III

### THE DISTRICT COURT ERRED IN NOT CONDUCTING AN EVIDENTIARY HEARING.

**Standard of review:** Where an inmate convicted in a state court seeks relief under 28 U.S.C. §2254, factual issues found by the state appellate court are presumed to be correct. The petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. If the petitioner has failed to develop the factual basis of his claims in the state court proceedings, he or she is not entitled to an evidentiary hearing unless the claim relies on a new rule of constitutional law made retroactive by the Supreme Court to cases on collateral review, or the factual predicate for the claim could not have been discovered previously with the exercise of due diligence. If established, the facts underlying the claim must show by clear and convincing evidence that, but for the constitutional error complained of, no reasonable fact-finder would have found the defendant guilty of the underlying offense. 28 U.S.C. §2254(e)(1)(2)(A)(i)(ii)(B).

**Portion of the record where the issue was raised and ruled upon:** Petitioner requested an evidentiary hearing on his claims of ineffective assistance

of trial counsel in the state appellate court. (State Court Record, Rule 3.11 application for evidentiary hearing) He requested an evidentiary hearing in his habeas petition and supporting brief. (Doc. 1, p. 34, App. 38; Doc. 2, pp. 18-19, App. 71-72) The magistrate judge recommended that an evidentiary hearing be denied. (Doc. 14, p. 16, App. 95) Mr. Nazario objected to the magistrate's judge's recommendation. (Doc. 15, pp. 6-7, App. 102-103) The district court adopted the magistrate's recommendation. (Doc. 16, App. 105-110)

## ARGUMENT

The district court held that, having ruled on the merits, Petitioner did not overcome the presumption of correctness which attached to the OCCA's findings by clear and convincing evidence, and was thus not entitled to an evidentiary hearing. *E.g., Parrino v. Archuleta,* 630 F. App'x 739, 741 (10th Cir. 2015).

A review of the impeachment evidence and the evidence supporting self-defense which was omitted from the trial lawyers' cross-examinations of Munoz and Dutchover, and which was recounted in detail above, shows that it was not "irrelevant" to the defense or problematic because these witnesses gave inconsistent statements and testimony, but that the impeachment was of such quantity and quality that the entire landscape of the trial would have changed. No

reasonable strategy lies in ignoring mounds of impeachment evidence and statements and testimony which support directly the defense raised at trial.

Prejudice is readily apparent due to the manner in which the jury wrestled with the case during deliberations. There is clear and convincing evidence that the presumption of correctness attaching to the OCCA's merits findings should not be honored in this case. But for the constitutional error here – ineffective assistance of trial counsel – no reasonable juror would have found Mr. Nazario guilty of second degree murder. 28 U.S.C. §2254(e)(1)(2). At a minimum, Mr. Nazario is entitled to an evidentiary hearing.

Because Mr. Nazario diligently tried to develop the facts in the state appeal by supplementing the record and seeking an evidentiary hearing, the restrictions of 28 U.S.C. §2254(e)(2)(A)(i)(ii) do not apply. The failings of counsel in this case based on what could have been done are not abstruse or obscure, but readily apparent. Because no reasonable strategy explains their cross-examinations of the two key witnesses, nor the failure to ask for a manslaughter instruction, if Petitioner's allegations are true and not contravened by the existing record, he is entitled to an evidentiary hearing if the existing record is not sufficient to grant him relief. *E.g., Anderson v. Attorney General of Kansas,* 435 F.3d 853, 858 (10th Cir. 2005)(Doc. 2, pp. 18-19, App. 71-72)

Accordingly, an evidentiary hearing should be ordered if relief cannot be granted on the existing record.

## PROPOSITION IV

## A CERTIFICATE OF APPEALABILITY SHOULD BE GRANTED ON MR. NAZARIO'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS.

**Standard of Review:** To proceed on an appeal from the denial of a petition filed under 28 U.S.C. §2254, the petitioner must receive a certificate of appealability. *Montez v. McKenna,* 208 F.3d 862, 867 (10th Cir. 2000). In determining whether a certificate of appealability should issue from the denial of a claim or claims in a habeas proceeding, a petitioner "need only demonstrate 'a substantial showing of the denial of a constitutional right.'" *Miller-El v. Cockrell,* 537 U.S. 322, 326 (2003), *quoting* 28 U.S.C. § 2253( c). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El,* 537 U.S. at 326. As the Supreme Court has explained:

> We do not require petitioner to prove, before the issuance of a COA
> that some jurists would grant the petition for habeas corpus. Indeed,
> a claim can be debatable even though every jurist of reason might
> agree after the COA has been granted and the case has received
> full consideration, that petitioner will not prevail.

*Miller-El,* 537 U.S. at 338.  *See also, Tennard v. Dretke,* 542 U.S. 274, 281-88 (2004).

**Portion of the record where the issue was raised and ruled upon:**  In the district court's order adopting the report and recommendation of the magistrate judge, the court denied a certificate of appealability.  (Docs. 16-17, App.105-110) Petitioner seeks a certificate of appealability from this Court on the issues raised above.

## ARGUMENT

The magistrate judge, whose report and recommendation was adopted by the district court, found trial counsel were not ineffective for failing to impeach Priscilla Munoz and Albert Dutchover with their statements to the police, which contained many significant inconsistencies bearing on the credibility of their trial testimony, since these inconsistencies would not have supported Mr. Nazario's self-defense claim.  The magistrate judge (and the district court) found also that trial counsel were not ineffective for failing to impeach Munoz and, in particular, Dutchover with portions of their preliminary hearing testimony and statements to the police that would both have impeached their trial testimony and supported Mr. Nazario's self-defense claim; Dutchover made inconsistent statements and gave

inconsistent testimony at the preliminary hearing, and bringing this out would have harmed, rather than advanced, the self-defense argument.

For the reasons explained in Propositions I and II, reasonable jurists could certainly disagree about the impact of the lines of cross-examination that were omitted, even though they were supported by existing black and white statements, as well as sworn testimony and videotape. Reasonable jurists could also disagree whether counsel performed unreasonably, to Mr. Nazrio's prejudice, in failing to request first-degree manslaughter instructions. Because the issues are hardly clear-cut, a certificate of appealability should be issued on the arguments made in the first three propositions, under the standard of *Miller-El, supra.*

## CONCLUSION

For the reasons and authorities stated above, the district court's denial of relief under 28 U.S.C. §2254 should be reversed with the direction that habeas relief be granted. In the alternative, the case should be remanded for an evidentiary hearing.

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Nazario does not request oral argument. The issues are sufficiently clear on the existing record to entitle him to habeas relief, or, at a minimum, to an evidentiary hearing.

Respectfully submitted,

/s/ David Autry
David Autry, OBA #11600
<u>1021 N.W. 16</u>th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669 [fax]
dbautry77@gmail.com

Lawyer for Petitioner/Appellant
Jimmy Nazario, Jr.

## CERTIFICATE OF MAILING AND ELECTRONIC SERVICE

This is to certify that on this 14th day of September, 2018, a true and correct copy fo the foregoing instrument was served by U.S. Mail, postage prepaid, to Theodore M. Peeper and Diane L. Slayton, Assistant Attorneys General, <u>313 N.E. 21</u>st St., Oklahoma City, OK 73105.  A copy was also served, via ECF, to Mr. Peeper at <u>Ted.Peeper@oag.ok.gov.</u> and <u>fhc.docket@oag.state.ok.gov.</u> , and to Ms. Slayton at <u>Diane.Slayton@oag.ok.gov</u> and <u>fhc.docket@oag.ok.gov.</u>  Additionally, a copy was sent, via U.S. Mail, to Jimmy Nazario, Jr., D.O.C. #694363, R.B. Dick Conner Correctional Center, 129 Conner Road, Hominy, OK 74035-0220.

/s/ David Autry

**CERTIFICATE OF DIGITAL SUBMISSIONS**

I hereby certify that with respect to the foregoing Re-Submitted Brief:

1.  All required privacy redactions have been made;

2.  If required to file additional hard copies, that the ECF submission is an exact copy of those documents;

3.  The ECF submission was scanned for viruses with the most recent version of a commercial virus scanning program, Norton Security, last updated on the date of this filing, and that according to the program, it is free of viruses.

/s/ David Autry

**CERTIFICATE OF COMPLIANCE**

As required by Fed.R.App.P. 32(a)(7)( C), I certify that this Brief is proportionally spaced and contains 10,520 words.  I relied on my word processor to obtain the count, and it is WordPerfect 12.  I certify that this information is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

/s/ David Autry

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| JIMMY NAZARIO, J.R., | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. CIV-16-1243-HE |
| | ) | |
| JOE ALLBAUGH, DIRECTOR, | ) | |
| | ) | |
| Respondent. | ) | |

## REPORT AND RECOMMENDATION

Petitioner, Jimmy Nazario, Jr., appearing through counsel, filed a Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 [Doc. No. 1] challenging his state court conviction in Case No. CF-2011-570, District Court of Comanche County, State of Oklahoma.  Chief United States District Judge Joe Heaton has referred the matter for proposed findings and recommendations consistent with 28 U.S.C. § 636(b)(1)(B) and (C).  Respondent has filed a Response [Doc. No. 8] and the State Court Records [Doc. No. 10],[1] and Petitioner has filed a Reply [Doc. No. 13].  For the reasons set forth below it is recommended that the Court DENY the Petition.

## I.    Relevant Factual and Procedural History

Petitioner, Priscilla Munoz, Albert Dutchover, and Jose Hernandez were walking towards Petitioner's home at the Motif Manor Apartments in Lawton, Oklahoma, when they encountered Ervin Manigault in the parking lot.  *See* Tr. Vol. I, at 230-31.  Mr. Manigault approached the foursome, asking if they had been responsible for "tagging" graffiti on the apartments.  *Id.* at 234-

---

[1] The State Court Records include the Transcript of Preliminary Hearing, hereinafter "Ph. Tr. ___," and the Original Record, hereinafter "Or. ___."  The record also includes the Transcript of Jury Trial Proceedings, held on February 10-12, 2014.  Though originally titled as Day One, Day Two, Day Three, the Court hereinafter references the transcripts as "Tr. Vol. ___."

35; Tr. Vol. II, at 27-28, 57.  Although Mr. Manigault's friend, Kaneisha Plummer, described Mr.

Manigault as calm and said his arms stayed at his sides while he spoke, *see* Tr. Vol. II, at 106-107,

Ms. Munoz and Mr. Dutchover described Mr. Manigault as agitated, yelling, and waving his arms

in the air.  *See* Tr. Vol. I, at 273-74; Vol. II, at 27, 42, 58.  Petitioner shot Mr. Manigault in the

chest, and then again in the back as the victim ran away.  *See* Tr. Vol. I, at 234-36; Vol. II, at 30-

32.  Mr. Manigault died from his wounds.  *See* Tr. Vol. II, at 219.

The State tried Petitioner for second degree murder.  *See* Or. at 1-2.[2]  Petitioner's attorney

argued that the shooting was done in self-defense, *see* Tr. Vol. I, at 219-21; Vol. III, at 20-25;

nevertheless, the jury convicted Petitioner.  *See* Or. at 631.  Per the jury's recommendation, the

trial court sentenced him to twenty-five years' imprisonment.  *See id.* at 631, 652.

Thereafter, Petitioner filed a direct appeal to the Oklahoma Court of Criminal Appeals

(OCCA).  *See* Opening Brief of Appellant Jimmy Nazario, Jr. [Doc. No. 8-Ex. 1].  The state

appellate court affirmed the conviction.  *See* OCCA Opinion [Doc. No. 8-Ex. 5].  The present

action timely followed.

## II.     <u>Grounds for Federal Habeas Corpus Relief</u>

Petitioner alleges in Ground One that his trial counsel was ineffective for failing to properly

impeach the witnesses, failing to bring forth favorable testimony, and introducing prior bad acts.

*See* Pet. at 5-28.  In Ground Two, Petitioner claims that the trial court denied him due process

when it refused to instruct the jury on the lesser-included offense of heat of passion manslaughter,

or, alternatively, that trial counsel was ineffective for failing to request the instruction.  *See id.* at

28-31.  Then, in Ground Three, Petitioner alleges a police detective engaged in improper vouching,

---

[2] Citations to the jury trial transcripts and original records refer to the original pagination in those
documents.  Citations for all other documents will refer to this Court's CM/ECF pagination.

and trial counsel failed to object.  *See id.* at 31-32.  Finally, in Ground Four, Petitioner argues that the State committed prosecutorial misconduct when it injected a racial motive into the case that was unsupported by the evidence.  *See id.* at 32.  Petitioner asks for an evidentiary hearing on the ineffective assistance of trial counsel claims.  *See id.* at 34.

## III.   <u>Standard of Review</u>

When, as here, the OCCA adjudicated Petitioner's claims on their merits, they are governed by the standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Pursuant to the AEDPA, this Court may grant habeas relief only if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented."  <u>28 U.S.C. § 2254(d)(1)</u> and <u>(2)</u>.

A state-court decision is contrary to clearly established federal law under <u>28 U.S.C. § 2254(d)(1)</u> if it "applies a rule that contradicts the governing law set forth in Supreme Court cases or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from that precedent."  *Ryder ex rel. Ryder*, <u>810 F.3d at 739</u> (internal quotation marks omitted).  "A state-court decision is an 'unreasonable application' of Supreme Court precedent if the decision 'correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case.'"  *Fairchild v. Trammell*, <u>784 F.3d 702, 711</u> (10th Cir. 2015) (*quoting Williams v. Taylor*, <u>529 U.S. 362, 407-08</u> (2000)).

"Review of a state court's factual findings under § 2254(d)(2) is similarly narrow."  *Smith*, <u>824 F.3d at 1241</u>.  Factual findings are not unreasonable merely because on habeas review the court "would have reached a different conclusion in the first instance."  *Brumfield v. Cain*, -- U.S.

3

-- <u>135 S. Ct. 2269, 2277</u> (2015) (citation omitted).  Instead, the court must defer to the state court's factual determinations so long as "reasonable minds reviewing the record might disagree about the finding in question." *Id*.  "Accordingly, a state court's factual findings are presumed correct, and the petitioner bears the burden of rebutting that presumption by 'clear and convincing evidence.'" *Smith*, <u>824 F.3d at 1241</u> (*citing* <u>28 U.S.C. § 2254(e)(1)</u>).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Woods v. Etherton*, -- U.S. --, <u>136 S. Ct. 1149, 1151</u> (2016) (internal quotation marks and citation omitted). "The state court decision must be so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. (internal quotation marks and citation omitted).

## IV.   <u>Analysis</u>

### A.   **Petitioner's Ground Two – Trial Court's Failure to Give a Lesser-Included Instruction**

In Ground Two,[3] Petitioner alleges that the trial court denied him due process when it failed to instruct the jury on the lesser-included crime of heat of passion manslaughter.  *See* Pet. at 28-30.  The OCCA rejected this claim on the merits, *see* OCCA Opinion at 3, but in this limited circumstance, the state appellate court's decision is irrelevant.  Petitioner's is a non-capital case. *See supra* p. 2.  Thus, regardless of the OCCA's decision, Petitioner is not entitled to habeas relief because "[n]either [the Tenth Circuit] nor the Supreme Court has recognized a federal constitutional right to a lesser included instruction in non-capital cases."  *Johnson v. Keith*, <u>726 F.3d 1134, 1135</u> n.2 (10th Cir. 2013); *see also Davis v. Roberts*, <u>579 F. App'x 662, 668</u> (10th Cir.

---

[3] For continuity, the Court addresses Petitioner's claims out of order.

2014) ("The Supreme Court has never recognized a federal constitutional right to a lesser included offense instruction in non-capital cases.").  Accordingly, the Court should deny habeas relief on this portion of Petitioner's Ground Two.  Petitioner's remaining Ground Two argument – alleging ineffective assistance of trial counsel – is addressed below.

### B.      Petitioner's Ground Three – Alleged Improper Vouching

According to Petitioner, Lawton Police Detective Roberto Peralta improperly characterized evidence and opined on the credibility of witnesses, depriving him of a fair trial.  *See* Pet. at 31-32.  Specifically, Petitioner claims that Detective Peralta:  (1) told the jury when "witnesses Munoz and Dutchover were telling the truth and when they were lying or not being forthcoming with the entire truth;" (2) "pronounce[d] that Duthcover had 'made up' his claim about seeing Mr. Manigault with a knife;" and (3) described the "homicide as a 'murder,' which was up to the jury to decide."  *Id.* at 31.

Reviewing for plain error, the OCCA rejected this claim on direct appeal, finding:

> [T]he testimony did not constitute impermissible vouching.  See *Warner v. State*, 2006 OK CR 40, ¶ 24, 144 P.3d 838, 860-61 (Where there was no expression of personal belief in the witness's credibility or that evidence not presented supports the witness's testimony there is no improper vouching).  Furthermore, the witnesses had already testified and admitted that they initially lied and then changed their story to the truth.  There is no plain error here.

OCCA Opinion at 4.

### 1.      Clearly Established Law

"Improper vouching for witnesses is not considered to impact an express constitutional right."  *United States v. Harlow*, 444 F.3d 1255, 1266 (10th Cir. 2006) (citation omitted).  And, the Supreme Court has never held that witness "vouching testimony itself violates the Due Process Clause."  *Parker v. Scott*, 394 F.3d 1302, 1310 (10th Cir. 2005); *see also Simpson v. Duckworth*, No. CIV-11-96-M, 2016 WL 3029966, at *20 (W.D. Okla. May 25, 2016) (unpublished district

court order) (citing cases noting the absence of any Supreme Court authority holding that vouching alone violates due process).  However, the Tenth Circuit Court of Appeals has recognized that vouching can compromise the fairness of the proceedings and implicate the Fourteenth Amendment's Due Process Clause, but only if it renders the trial fundamentally unfair.  *See Parker*, 394 F.3d at 1310.

As discussed, the OCCA applied a "plain error" standard to this claim.  Notably, "Oklahoma's formulation of the plain-error standard is virtually identical to the constitutional test for due process."  *Hancock v. Trammell*, 798 F.3d 1002, 1011 (10th Cir. 2015).  So when the OCCA "rejected [Petitioner's] claim under the plain-error standard, the decision effectively disallowed the possibility of a due process violation."  *Id.*  This Court must then defer to the OCCA's ruling unless it "'unreasonably applied'" the due process test.  *Thornburg v. Mullin*, 422 F.3d 1113, 1125 (10th Cir. 2005) (internal brackets and citation omitted); *see also Eizember v. Trammell*, 803 F.3d 1129, 1138 n.1 (10th Cir. 2015) (holding the court would apply deference to the OCCA's plain error analysis).

### 2.     Analysis

The Court should find that the OCCA reasonably applied federal law in rejecting Petitioner's vouching claim.  Detective Peralta did comment that, after lengthy questioning, Ms. Munoz "finally told [him] the truth."  Tr. Vol. II, at 194.  Similarly, the officer told the jury that Mr. Dutchover had only told him "part of the truth."  *Id.* at 196.  But this was all evidence independently before the jury, *see* Tr. Vol. I, at 253-54; Vol. II, at 45, thus negating any fundamental unfairness.  *See, e.g., Johnson v. Ezell*, No. CIV-11-379-C, 2011 WL 7396605, at *11-12 (W.D. Okla. Dec. 20, 2011) (unpublished report and recommendation) (finding the OCCA reasonably applied federal law when it found no fundamental unfairness in police offers' alleged

witness vouching where the testimony simply reiterated other evidence before the jury), *adopted*, 2012 WL 528182 (W.D. Okla. Feb. 17, 2012), *appeal dismissed* 490 F. App'x 151 (10th Cir. 2012).   Finally, Petitioner simply cannot demonstrate that his entire trial was rendered fundamentally unfair when the police detective, in only one instance, characterized the killing as a murder.  *See United States v. Encinias*, 123 F. App'x 924, 942 (10th Cir. 2005) (noting that "a fair trial is not necessarily a perfect one" and finding no fundamental unfairness in "inadvertent references" to "murder" when discussing the victim's death).   As such, the Court should deny habeas relief on this portion of Ground Three.   The remaining Ground Three argument – that trial counsel was ineffective for failing to object to the alleged vouching – is addressed below.

> ### C.   Petitioner's Grounds One, Two & Three – Alleged Ineffective Assistance of Counsel

In Ground One, Petitioner alleges that his trial attorney was ineffective for failing to properly impeach the witnesses, failing to bring forth favorable testimony, and introducing prior bad acts.  *See* Pet. at 5-28.  Specifically, Petitioner argues that his attorney failed to impeach Ms. Munoz and Mr. Dutchover with their prior inconsistent statements (during police interviews and at preliminary hearing) and failed to elicit evidence from these witnesses to support Petitioner's self-defense theory.  *See id.* at 19-27.  Petitioner also claims his attorney intentionally brought forth testimony that Petitioner had been involved in an assault on one of Mr. Manigault's friends days before the shooting.  *See id.* at 27-28.

In Ground Two, Petitioner claims his trial attorney should have requested a lesser-included instruction, *see id.* at 30-31, and in Ground Three, Petitioner alleges his attorney was ineffective for failing to object to improper vouching.  *See id.* at 31-32.

The OCCA addressed these allegations on direct appeal, holding:

[Ground One:]  [W]e find that [Petitioner] has not shown that counsel's conduct fell below the wide range of reasonable professional conduct, or that the result of the proceeding would have been different had counsel performed as he now, in hindsight, would have preferred.  *Strickland v. Washington*, 466 U.S. 668, 689 (1984).  [Petitioner] suffered no prejudice in counsel's failure to utilize available information to cross-examine witnesses more thoroughly or in counsel's inquiry into an earlier confrontation between [Petitioner's] friends and the victim's friend at the apartments.  This latter information was important to show why [Petitioner] might have been fearful of retribution from individuals at the apartment, thus support his claim of self-defense.

OCCA Opinion at 2 (*Strickland's* long citation omitted).

[Ground Two:]  Instructions on first-degree manslaughter require that a person act with a "heat of passion" caused by "adequate provocation."  21 O.S.2011, § 711. There was no evidence to support the giving of the instructions as the evidence did not show that [Petitioner's] actions were aroused by adequate provocation.  . . . [Therefore], counsel was not ineffective in failing to request said instructions.

*Id.* at 3.

[Ground Three:]  [T]he testimony did not constitute impermissible vouching.  *See Warner v. State*, 2006 OK CR 40, ¶ 24, 144 P.3d 838, 860-61 (Where there was no expression of personal belief in the witness's credibility or that evidence not presented supports the witness's testimony there is no improper vouching). Furthermore, the witnesses had already testified and admitted that they initially lied and then changed their story to the truth.  . . .  [Therefore], counsel was not ineffective in failing to object to the testimony.

*Id.* at 4.

## 1.    Clearly Established Law

To succeed on his claims, Petitioner must demonstrate that his trial counsel's performance was both deficient and prejudicial.  *See Strickland*, 466 U.S. at 690-91.  A court will only consider a performance "deficient" if it falls "outside the wide range of professionally competent assistance."  *Id.* at 690.  "[P]rejudice" involves "a reasonable probability that, but for counsel's unprofessional errors, the result of the [trial] would have been different."  *Id.* at 694.  Notably, a court reviews an ineffective assistance of counsel claim from the perspective of counsel at the time he or she rendered the legal services, not in hindsight.  *See id.* at 680.

"Surmounting *Strickland's* high bar is never an easy task." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (internal quotation marks and citation omitted). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult [as] [t]he standards created by *Strickland* and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." *Id.* (internal quotations marks and citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

### 2. Ground One – Counsel's Questioning of Ms. Munoz and Mr. Dutchover

Petitioner first claims that his trial attorney failed to impeach Ms. Munoz and Mr. Dutchover with their prior inconsistent statements and failed to elicit evidence from these witnesses to support Petitioner's self-defense theory. *See* Pet. at 19-27. Notably, "the manner in which counsel cross-examines a particular witness is a strategic choice and therefore 'virtually unchallengeable.'" *Kessler v. Cline*, 335 F. App'x 768, 770 (10th Cir. 2009) (*citing Strickland*, 466 U.S. at 690). Against that backdrop, the Court should find that the OCCA reasonably applied *Strickland* in denying these allegations on direct appeal.

### a. The Attorney's Alleged Failure to Impeach

According to Petitioner, Ms. Munoz testified at trial that she saw Petitioner's hand raise and then saw two flashes; however, at preliminary hearing, the same witness said that "she did not see a gun, and was not sure if Petitioner even had a gun." *See id.* at 19. Petitioner claims his attorney was ineffective for failing to challenge the inconsistency. *See id.* Additionally, Petitioner believes his attorney should have spent more time exploring the fact that Ms. Munoz first told police that she was not even at the scene, then said she was there but did not see who had the gun,

and then only told police that Petitioner had shot Mr. Manigault after being threatened and bullied by the police detective. *See id.* at 19-23. Petitioner likewise believes his attorney should have questioned Mr. Dutchover more extensively about his initial police interview, where he also denied being present during the shooting. *See id.* at 25. Finally, Petitioner argues his attorney should have focused more on Ms. Munoz and Mr. Dutchover's immunity from prosecution to show they were biased and lacked credibility. *See id.* at 23-25, 27.

At its core, Petitioner's argument suggests that his attorney should have questioned Ms. Munoz and Mr. Dutchover so as to prove that Petitioner did not shoot the victim, and/or to show that they were testifying in that manner because they had been threatened with prosecution. *See id.* at 19-25. But as noted above, "counsel's decisions regarding how best to cross-examine witnesses presumptively arise from sound trial strategy." *Richie v. Mullin*, 417 F.3d 1117, 1124 (10th Cir. 2005); *see also United States v Dormer*, 440 F. App'x 639, 642 (10th Cir. 2011) ("[L]ike most trial decisions, [a] trial counsel's decision whether to cross-examine and what questions to ask [is] presumptively reasonable."). Here, that strategy is self-evident. That is, Petitioner's entire theory at trial was that he *did* shoot Mr. Manigault, but in self-defense. *See* Tr. Vol. I, at 219-21 (defense counsel's opening statement); Tr. Vol. III, at 20-25 (defense counsel's closing arguments). To that end, Ms. Munoz and Mr. Dutchover were the only witnesses who described Mr. Manigault as acting aggressively. *See supra* p. 2. In fact, Petitioner argues below that trial counsel failed to elicit *enough* testimony from Ms. Munoz and Mr. Dutchover to show that Mr. Manigault was the aggressor. *See infra* p. 11. It is therefore entirely reasonable that Petitioner's attorney chose not to focus too heavily on these witnesses' initial interviews or to try and discredit

them, and as such, the Court should find that the OCCA reasonably applied *Strickland* in rejecting

this argument on direct appeal.[4]

### b.    The Attorney's Alleged Failure to Elicit Testimony

Petitioner next focuses on his attorney's alleged failure to elicit appropriate testimony to

prove that the victim was the aggressor.  Specifically, and although he mentions Ms. Munoz,

Petitioner's overriding argument is that Mr. Dutchover gave more extensive testimony at

preliminary hearing and in police interviews regarding the victim's aggressions.  *See* Pet. at 21,

25-26.

At preliminary hearing, Mr. Dutchover testified that Mr. Manigault approached the

foursome, accusing them of crossing out his gang symbols.  *See* Ph. Tr. at 95.  Mr. Dutchover said

the victim starting "balling up his fist like he was going to do something, and we told him to back

up, and he still kept on approaching, and that's when everything happened."  *Id.* at 97.  Mr.

Dutchover said Petitioner took his gun out "to protect himself."  *Id.* at 98.  Mr. Dutchover said he

then heard "two shots" and that the first shot hit Mr. Manigault "in his chest."  *Id.* at 100.  Mr.

Dutchover had not seen anything in Mr. Manigault's hands.  *See id.*  On cross-examination, Mr.

Dutchover agreed that he told the police detectives that another man had been with Mr. Manigault,

that they both had knives, and that many people were gathering around, seemingly in support of

Mr. Manigault.  *See id.* at 112-15.  He then said all that was "true."  *Id.*  But on re-cross, Mr.

Dutchover admitted that he:  (1) had lied to police "in the beginning;" (2) did not know if the other

people in the parking lot were with Mr. Manigault; and (3) "never saw a knife."  *Id.* at 116-17.

---

[4] Notably, Ms. Munoz was very clear in her direct testimony at trial that she did not ever see the gun; moreover, both Ms. Munoz and Mr. Dutchover admitted they initially gave different versions of events to police detectives and had been granted immunity.  *See* Tr. Vol. I, at 240, 253-254, 261-62, 266, 291; Tr. Vol. II, at 45, 63.

Petitioner believes that, at trial, his attorney should have questioned Mr. Dutchover about his statements to police, particularly those about the men with knives and the gathering crowd. *See* Pet. at 25-27.  But as noted above, Mr. Dutchover's preliminary hearing testimony was quite inconsistent, and, in parts, damaging to Petitioner's self-defense theory.  The Court may presume then that the trial attorney made a strategic decision not to pursue this line of questioning.  *See Richie*, 417 F.3d at 1124; *see also Hanson v. Sherrod*, 797 F.3d 810, 827-28 (10th Cir. 2015) (finding trial attorney's decision not to elicit witness testimony which "had credibility problems and was known for being unreliable" was "sound strategy" and not ineffective assistance of counsel).

Additionally, Mr. Dutchover *did* offer testimony that supported Petitioner's self-defense theory.  That is, he testified that Petitioner took the gun with him that night because he thought "people from [a gang] were looking for [him]."  Tr. Vol. II, at 29.  Mr. Dutchover also testified that Mr. Manigault:  (1) approached the foursome "shouting" and confronting them about "tagging the complex;" (2) "wouldn't listen" when Petitioner told him to back off; and, (3) kept balling up his fists and pulling up his pants with his hand "close to his pockets."  *Id.* at 27-30, 42.  According to Mr. Dutchover, that is when Petitioner "panicked and fired."  *Id.* at 30.  Mr. Dutchover admitted that when Mr. Manigault approached, he "thought we were going to have a big brawl there."  *Id.* at 60.

In sum, Petitioner's attorney elicited testimony suggesting that the victim was the aggressor while avoiding the use of conflicting and potentially unreliable testimony.  Accordingly, Petitioner has failed to demonstrate that the OCCA unreasonably applied *Strickland* when it found that trial counsel's cross-examination was neither deficient nor prejudicial.

### 3.   Ground One – The Attorney's Introduction of Prior Bad Acts

Petitioner's attorney brought forth testimony that just a few days prior to the shooting, Petitioner and Mr. Dutchover had "jumped" one of Mr. Manigault's friends.  *See* Tr. Vol. II, at 48-49, 51.  Petitioner claims this introduction of prior bad acts constituted ineffective assistance of trial counsel.  *See* Pet. at 27-28.  However, the attorney used that information to suggest that Petitioner reasonably believed that Mr. Manigault intended him death or great bodily harm.  *See* Tr. Vol. III, at 23-24.  Thus, as the OCCA reasonably concluded, trial counsel was engaged in sound trial strategy and, as such, was not constitutionally ineffective.  *See, e.g., Lockett v. Trammell*, 771 F.3d 1218, 1248-49 (10th Cir. 2013) (finding trial counsel was engaged in trial strategy where he presented a defense that admitted wrong doing).

### 4.   Ground Two – Counsel's Failure to Request a Lesser-Included Instruction

In Ground Two, Petitioner alleges that his trial counsel should have requested a lesser-included instruction on heat of passion manslaughter.  *See* Pet. at 30-31.  In support, Petitioner argues that Mr. Manigault had his "fists balled up," refused to "back off" and "made movements towards his pants."  *Id.*  However, the OCCA found that these facts did not establish "adequate provocation" as defined by Oklahoma state law, and both its factual determination and application of state law is controlling.  *See supra* pp. 3-4;[5] *see also Goertz v. Chrisman*, 2018 WL 746532, at *1, n.1, -- F. App'x -- (10th Cir. 2018) (noting that the court lacks "authority to review the OCCA's determination" regarding the giving of an "instruction under Oklahoma law" and citing *House*, 527 F.3d at 1025, as holding:  "On collateral review, we cannot review a state court's interpretation of its own state law.").  Because the instruction was not warranted, the OCCA reasonably applied

---

[5] A petitioner can overcome the Court's presumption that the OCCA's factual finding was correct, but only with clear and convincing evidence.  *See supra* p. 4.  Petitioner does not carry his burden.

*Strickland* in finding that counsel was not ineffective for failing to request the instruction. *See Hicks v. Jones*, 350 F. App'x 199, 204 (10th Cir. 2009) ("We have already determined that Hicks was not entitled to an instruction on the lesser-included offense of negligent homicide. Consequently, his trial counsel could not have been constitutionally deficient for choosing not to seek such an instruction or failing to consult with him about the instruction.").

### 5.      Ground Three – Counsel's Failure to Object to Alleged Vouching

Finally, Petitioner claims that his attorney was constitutionally ineffective for failing to object to Detective Peralta's alleged vouching. *See* Pet. at 31-32. As discussed above however, the OCCA reasonably applied federal law when it found no fundamental unfairness in the officer's testimony. *See supra* pp. 5-7. As such, Petitioner cannot establish his attorney had a constitutional duty to object, or that that the outcome of his trial would have been different had his attorney lodged the objection. *See Williams v. Trammell*, 782 F.3d 1184, 1202-1206 (10th Cir. 2015) (finding the OCCA reasonably applied *Strickland* to find no ineffective assistance of counsel in the trial attorney's failure to lodge a meritless objection). Consequently, Petitioner cannot show the OCCA unreasonably applied *Strickland* when it rejected this claim on direct appeal and this Court should deny habeas relief.

### D.      Petitioner's Ground Four – Alleged Prosecutorial Misconduct

Finally, in Ground Four, Petitioner alleges that the State impermissibly injected a racial motive into the case with no supporting evidence. *See* Pet. at 32. Again applying plain error, the OCCA held on direct appeal:

> Defense counsel opened the door by first hinting at racial tensions between [Petitioner's] friends and the victim, probably in an attempt to show that [Petitioner] was justified in using self-defense. The evidence indicated that tensions were caused by rival gang graffiti. The additional comments of the prosecutor did nothing to affect the outcome of this case; therefore, we find no plain error.

OCCA Opinion at 4.

### 1.     Clearly Established Law

"Prosecutorial misconduct can result in constitutional error if it 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *DeRosa v. Workman*, 679 F.3d 1196, 1222 (10th Cir.2012) (*quoting Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "The ultimate question is whether the jury was able to fairly judge the evidence in light of the prosecutors' conduct." *Bland v. Sirmons*, 459 F.3d 999, 1024 (10th Cir.2006).

### 2.     Analysis

The Court should find that the OCCA reasonably applied federal law in rejecting Petitioner's prosecutorial misconduct claim.  That is, Mr. Dutchover testified that Petitioner had tattoos on his hands showing affiliation with the "South Side Locos."  Tr. Vol. II, at 13.  Then, on cross-examination, defense counsel elicited testimony from Mr. Dutchover showing that some of the "tagging" done at Petitioner's apartment complex stood for "[b]rown power," signifying "proud to be a Mexican."  *Id.* at 50.  On re-direct, Mr. Dutchover then testified that the person he and Petitioner had "jumped" a few days before the shooting was "[b]lack."  *Id.* at 66.  However, the witness denied that Petitioner had "something against black people," *id.* at 66-67, and agreed that Petitioner had once had "a black girlfriend."  *Id.* at 68.  In closing, the prosecutor argued:

> You've heard he has tattoos on his person where he's a South Side Lo[c]o.  Couple of days before this they already beat up a black guy.  They beat up a black guy in the apartment complex of [Petitioner].  Now do they have something with black people?  I asked them and he said no.  You know, is it just a coincidence?  Perhaps.

Tr. Vol. III, at 30-31.

"The prosecutor is entitled to argue to the jury that it should draw reasonable inferences from the evidence to support the government's theory of the case."  *United States v. Dazey*, 403 F.3d 1147, 1170 (10th Cir. 2005).  That is what happened here, and the Court should therefore find

the OCCA's rejection of this claim to be reasonable under federal law.  *See Gaines v. Workman*, 326 F. App'x 449, 454 (10th Cir. 2009) (finding the OCCA reasonably rejected petitioner's prosecutorial misconduct claim where "prosecutor's closing argument was based on reasonable inferences from the evidence and was fair comment on victim bias").

## V.     <u>Request for Evidentiary Hearing</u>

As a final matter, the Court should deny Petitioner's request for an evidentiary hearing on his ineffective assistance of trial counsel claims.

The Supreme Court has clarified that "evidence introduced in federal court has no bearing on a § 2254(d)(1) review."  *Cullen v. Pinholster*, 563 U.S. 170, 185 (2011).  So, "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court."  *Id.*  Here, the OCCA adjudicated Petitioner's claims on the merits, and this Court's review is thus limited to determining whether the state court's adjudication was reasonable under § 2254(d)(1).  As illustrated above, Petitioner has not overcome § 2254(d)(1)'s deference, and the Court should thus deny Petitioner's request for an evidentiary hearing.  *See Parrino v. Archuleta*, 630 F. App'x. 739, 741 (10th Cir. 2015) ("Under [applicable Supreme Court law], federal review of 2254(d)(1) petitions must be limited to the state court record.").

## <u>RECOMMENDATION</u>

For the foregoing reasons, it is recommended that the Court DENY the Petition [Doc. No. 1].

## <u>NOTICE OF RIGHT TO OBJECT</u>

The parties are advised of their right to object to this Report and Recommendation.  *See* 28 U.S.C. § 636.  Any objection must be filed with the Clerk of the District Court by March 6, 2018.

*See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to make timely objection to this Report and Recommendation waives the right to appellate review of the factual and legal issues addressed herein.  *See Moore v. United States*, 950 F.2d 656 (10th Cir. 1991).

### STATUS OF REFERRAL

This Report and Recommendation terminates the Chief District Judge's referral in this matter.

ENTERED this 13th day of February, 2018.

BERNARD M. JONES
UNITED STATES MAGISTRATE JUDGE

# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JIMMY NAZARIO, JR. | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | NO. CIV-16-1243-HE |
| | ) | |
| JOE ALLBAUGH, | ) | |
| | ) | |
| Respondent. | ) | |

## ORDER

Petitioner, a state prisoner appearing through counsel, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his state court conviction. The matter was referred to U.S. Magistrate Judge Bernard M. Jones for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B) and (C). Judge Jones has issued a Report and Recommendation (the "Report") recommending that the petition be denied. Petitioner has filed an objection to the Report which triggers *de novo* review of by this court of proposed findings or recommendations to which objection has been made. Casanova v. Ulibarri, 595 F.3d 1120, 1123 (10th Cir. 2010); *see also* 28 U.S.C. § 636(b)(1)(C).

A jury in Comanche County convicted petitioner of second degree murder, and he was sentenced to twenty-five years imprisonment. Petitioner's conviction was affirmed on direct appeal by the Oklahoma Court of Criminal Appeals ("OCCA"). Petitioner raised four grounds for relief in his direct appeal, all of which the OCCA reviewed and rejected in a summary opinion. Petitioner did not seek post-conviction relief in state court.

Here, petitioner relies on the same four grounds that were raised on direct appeal. Because the OCCA addressed the merits of petitioner's claims, this court's review is governed by 28 U.S.C. § 2254(d). The Supreme Court has repeatedly acknowledged that Section 2254(d) "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Burt v. Titlow, 571 U.S. 12, 134 S. Ct. 10, 16 (2013). Relief may only be granted "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." Harrington v. Richter, 562 U.S. 86, 102 (2011).

Petitioner has limited his objections to the Report's determinations: (1) that trial counsel was not ineffective by failing to impeach two witnesses and to elicit testimony favorable to self-defense (from Ground One); (2) that trial counsel was not ineffective by failing to request a jury instruction on the lesser included offense of manslaughter (from Ground Two); and (3) that the court should deny petitioner's request for an evidentiary hearing on the ineffective assistance of counsel claims. Petitioner argues both that trial counsel was ineffective and that the OCCA's decision with respect to these issues was "unreasonable in light of the facts and contrary to, or an unreasonable application of Strickland v. Washington. Doc. # 15, p. 6.[1]

To show constitutionally deficient performance by counsel, a petitioner must establish both that counsel's performance fell below an objective standard of reasonableness and that there was prejudice as a result. Strickland v. Washington, 466 U.S.

---

[1] *References to filings with this court are to the CM/ECF document and page number.*

668, 688 & 692 (1984).   A court considering an ineffective assistance claim applies a "strong presumption" that counsel's representation was within the "wide range of reasonable professional assistance."  *Id.* at 689.  With respect to the prejudice element, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  It is not enough to show that counsel's errors had some conceivable effect on the outcome of the proceeding. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id.* at 687.  The Strickland standard for judging counsel's representation is a "most deferential one" and that is true even for a court reviewing the performance in the first instance.  Harrington, 562 U.S. at 105.  But this court is not reviewing the matter in the first instance.  Rather, it is assessing whether the state court's determination of the matter involved an "unreasonable application of" the Strickland standard.

For purposes of § 2254(d), "'an unreasonable application of federal law is different from an incorrect application of federal law.'"  *Id.* at 101 (quoting Williams v. Taylor, 529 U.S. 362, 410 (2000)).  The state court determination is granted "deference and latitude that are not in operation when the case involves review under the Strickland standard itself. *Id.*  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Id.* (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  Stated otherwise, the petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.* at 103.  And even a "strong case

3

for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102.

Petitioner alleges that counsel's failure to impeach witnesses Munoz and Dutchover with prior statements to police and with preliminary hearing testimony was ineffective assistance of counsel because such impeachment would have "undercut their overall credibility, and therefore the State's theory that Petitioner committed second degree murder." Doc. #15, p. 2. But petitioner was relying on these witnesses to establish his self-defense argument. Thus, it cannot be stated with certainty that it was unreasonable for counsel to fail to further impeach those witnesses. Also, as the Report highlights, the very statements that petitioner believes should have been used to impeach the witnesses undercut his self-defense claim. While impeaching a witness with prior inconsistent statements may be "elementary, and effective cross-examination" as petitioner states, not impeaching a witness may reasonably be part of a counsel's strategy that this court will not second guess on hindsight during habeas review.

Petitioner also asserts that trial counsel should have elicited additional testimony from Munoz and Dutchover regarding his claim of self-defense. Specifically, petitioner points to testimony Dutchover provided at the preliminary hearing as more supportive of his claim of self-defense. But both Munoz and Dutchover had admitted that certain of their earlier statements and testimony were untruthful. Counsel's decision to avoid highlighting this fact, when relying on the witnesses to establish a defense, is within the range of reasonable choices prudent counsel may make. Further, there is no reasonable probability that a different choice would have affected the outcome.

4

Petitioner also argues that the failure of trial counsel to seek an instruction on the lesser offense of manslaughter constituted ineffective assistance of counsel and that the OCCA's rejection of this argument was an unreasonable application of, or contrary to, Strickland. But, as noted in the Report, the OCCA concluded that there "was no evidence to support the giving of the instructions as the evidence did not show that Nazario's actions were aroused by adequate provocation." Doc. #8-5, p. 3. This conclusion was not so lacking in justification as to preclude the possibility for fairminded disagreement about it.

Applying the standards of Strickland and Harrington to petitioner's motion, the court concludes he has failed to show a basis for habeas relief. The court cannot say that the state court determination was so lacking in justification that fairminded jurists could not have reached it. Further, petitioner has not shown a sufficient basis for overcoming the limitation of § 2254(d), and there is hence no basis for the requested evidentiary hearing. *See* Cullen v. Pinholster, 563 U.S. 170, 185 (2011).

Accordingly, the Report and Recommendation [Doc. #14] is **ADOPTED** and the petition for writ of habeas corpus [Doc. #1] is **DENIED**. Because petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability is also denied.

**IT IS SO ORDERED**.

Dated this 11th day of April, 2018.

JOE HEATON
CHIEF U.S. DISTRICT JUDGE

5

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JIMMY NAZARIO, JR. | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | NO. CIV-16-1243-HE |
| | ) | |
| JOE ALLBAUGH, | ) | |
| | ) | |
| Respondent. | ) | |

## **JUDGMENT**

In accordance with the order entered this date, petitioner's petition for writ of habeas corpus is denied.

**IT IS SO ORDERED**.

Dated this 11th day of April, 2018.


_____
JOE HEATON
CHIEF U.S. DISTRICT JUDGE